## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

Robert Rothman,

     Plaintiff,

     v.

Bank of America Corporation; Bank of
America, National Association; Merrill
Lynch, Pierce, Fenner & Smith
Incorporated; BofA Securities, Inc.; and
U.S. Trust Company of Delaware;

     Defendants.

_____/

Case No.

**Demand for a Jury Trial**

## COMPLAINT IN CIVIL ACTION

Plaintiff Robert Rothman, by and through undersigned counsel, hereby sues Defendants and their respective affiliated entities for damages and other relief as a result of Defendants' Breaches of Fiduciary Duty, violations of the Florida Civil Remedies for Criminal Practices Act, violations of the Racketeer Influenced and Corrupt Organization Act (RICO), Conspiracy by Coercion, Aiding and Abetting Breaches of Fiduciary Duty, Negligent Misrepresentation and Negligence.

Defendants, by and through their respective officers, employees and agents acting within the course and scope of their employment with Defendants, engaged in improper financial dealings regarding various business transactions involving the National Football League franchise currently known as the Washington

Commanders and its affiliated entities (hereinafter collectively "Commanders" or "Franchise"). Defendants violated federal and state law and conspired with and aided and abetted various individuals and entities in a manner that resulted in serious and substantial financial harm in Florida to Robert Rothman as follows:

**PARTIES**

1.    Plaintiff Robert Rothman, (hereinafter "Rothman" or "Plaintiff"), is a resident of the State of Florida and continuously for more than twenty-five (25) years has been a client of Bank of America's "Wealth Management and Family Office Practice."

2.    Defendant Bank of America Corporation is a global banking, investment and financial institution incorporated in the State of Delaware with its principal place of business located at 100 North Tryon Street, Charlotte, North Carolina 28255. Bank of America Corporation is a foreign profit corporation[1] registered to conduct business in the State of Florida.

3.    Defendant Bank of America, National Association, (hereinafter "Bank of America N.A.") is a federally chartered banking, issuing and lending subsidiary of Bank of America Corporation, created under 12 U.S.C. § 21, with its principal place of business located at 100 North Tryon Street, Charlotte, North Carolina 28255.

---

[1] https://search.sunbiz.org/Inquiry/CorporationSearch/GetDocument?aggregateId=forp-f98000005807-201d1379-d126-4bf5-ad68-4a588423c159&transactionId=f98000005807-0b2b59d3-c923-4515-8539-c365ee5b804e&formatType=PDF

Bank of America, N.A. is a foreign corporation[2] registered to conduct business in the State of Florida.

4.      Defendant Merrill Lynch, Pierce, Fenner & Smith, Incorporated, (hereinafter "MLPFS"), is a Delaware corporation with its principal place of business located at One Bryant Park, New York, New York 10036. MLPFS is and has been the investment and wealth management division of Bank of America Corporation engaged in the prime brokerage and broker-dealer activities of Bank of America Corporation since September of 2008. MLFPS is a foreign corporation[3] registered to conduct business in the State of Florida.

5.      Defendant BofA Securities, Inc., (hereinafter "BofA Securities"), is a Delaware corporation with its principal place of business located at One Bryant Park, New York, New York 10036. BofA Securities is the investment banking arm of Bank of America Corporation which, along with MLPFS, has been, and continues to be, engaged with prime brokerage and broker-dealer activities of Bank of America

---

[2] https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=BANKAMERICANATIONALASSOCIATION%20Q170000000020&aggregateId=agent-q17000000002-eac31588-f3e9-4f42-9e96-ff6a170cdcf4&searchTe
[3] https://search.sunbiz.org/Inquiry/CorporationSearch/GetDocument?aggregateId=forp-813294-d170ce94-f342-4d90-a1ad-df95877d07e0&transactionId=813294-fbcb0bdd-18c2-4585-b275-197b1c6d91a5&formatType=PDF

Corporation. BofA Securities is a foreign corporation[4] registered to conduct business in the State of Florida.

6.     Defendant U.S. Trust Company of Delaware, (hereinafter "U.S. Trust"), is a Delaware corporation with its principal place of business located at 1017 North Walnut Street, Wilmington, Delaware 19801. U.S. Trust provides trust, fiduciary and investment management services, which are offered and provided by Bank of America, N.A. and is a wholly owned subsidiary of Bank of America Corporation. U.S. Trust is a foreign corporation registered to conduct business in the State of Florida.[5]

7.     At all times relevant to this Complaint, Bank of America Corporation, Bank of America, N.A., MLFPS, BofA Securities and U.S. Trust collectively operated a global banking, lending, investment and wealth management business commonly referred to or known as "Bank of America" and/or "BofA" (or hereinafter, collectively, "Defendants").

---

[4] https://search.sunbiz.org/Inquiry/CorporationSearch/GetDocument?aggregateId=forp-f16000001353-4dfc6a5d-5982-4bbb-be20-2ec919a0f64d&transactionId=f16000001353-f9a96117-d555-4705-94ec-5512cdd0228a&formatType=PDF
[5] https://search.sunbiz.org/Inquiry/CorporationSearch/GetDocument?aggregateId=forp-f03000002061-5e6bbb19-1e2d-43d1-b696-981bece07708&transactionId=f03000002061-ce61d89c-f3f9-4b5b-ac00-463a22234878&formatType=PDF

8.    By way of public disclosure, Bank of America Corporation claims to operate

pursuant to the following organizational flowchart:[6]



## Bank of America Corporation: Select Subsidiaries[1]
As of March 31, 2023



[1] This chart includes only select client-facing or issuing subsidiaries and associated significant holding companies of Bank of America Corporation. Not all subsidiaries of Bank of America are represented.
[2] Reflects a majority-owned subsidiary.

---

[6] https://d1io3yog0oux5.cloudfront.net/bankofamerica/files/pages/bankofamerica/db/843/description/2023-0331_BAC_Corporate_Structure.pdf

## JURISDICTION

9.     This Court has subject matter jurisdiction over these claims pursuant to 18 U.S.C. § 1332(a)(1) as the matter in controversy exceeds $75,000.00 and complete diversity of citizenship exists between the parties.

10.    Further, this Court has federal question jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331.

11.    This Court also has supplemental jurisdiction of Rothman's state law claims pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein are part of a uniform pattern and practice and form part of the same case or controversy.

12.    Defendants herein are registered as foreign corporate entities doing business within the State of Florida and each lists CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324 as their respective statutory agent to receive service of process within the State of Florida.

13.    Defendants have derived substantial financial benefit by conducting business in the State of Florida.

## VENUE

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) on the grounds that some or all of the conduct at issue substantially occurred in the Middle District of Florida.

15.     Further, venue is proper in this District pursuant to 18 U.S.C. § 1965(a) in that Bank of America Corporation, Bank of America, N.A., MLPFS, BofA Securities, Inc. and U.S. Trust have conducted business with Rothman at Bank of America's Tampa Headquarters located at Bank of America Plaza, 101 E. Kennedy Boulevard, Tampa, Florida 33602.

## FACTUAL BACKGROUND

16.     For more than 25 years, Bank of America Corporation, by and through its subsidiaries, agents and employees, has conducted significant banking, lending and investment business in Tampa, Florida.

17.     During those years, Bank of America Corporation has procured and maintained clients, including Rothman, by advertising that its Wealth Management and Family Office practices provide specialized consulting **"dedicated to extending the reach and legacy of some of the nation's most affluent families by listening intently, advising intelligently and executing skillfully along with control and confidentiality."** (Emphasis added).[7]

18.     Defendants, by way of public disclosures, including but not limited to those of BofA Securities, MLFPS and U.S. Trust, represent to the public that: "In the event

---

[7] https://www.privatebank.bankofamerica.com/solutions/family-office.html

that we provide you with a recommendation as your broker-dealer, we have to act in your best interest and not put our interest ahead of yours."

19. In addition to financial and investment advice, the Family Office services advertised and provided by Defendants to Rothman included:

(a) data aggregation and reporting designed to manage complex financial issues;

(b) implementing and administering complex and sophisticated estate plans, including coordinating and communicating with other advisors;

(c) accounting processes with integrated financial statements, cash flow and expense analysis and reporting, as well as entity and partnership accounting;

(d) broad insights across family enterprise considerations, including estate and generational transfer planning, structure and governance decisions, and operational and technology solutions; and

(e) full-service bill payment and platform solutions to manage cash and expenses.

### *Bank of America's Historical Relationship with Rothman*

20. Rothman became a client of Bank of America Corporation's "Wealth Management and Family Office Practice" in the Corporation's Tampa, Florida offices beginning in the early 1990's.

21.    From the early 1990's to present, Defendants performed a variety of wealth management and investment services for Rothman as Rothman entrusted Defendants with a significant amount of his personal wealth.

22.    In exchange for financial compensation, Rothman's Bank of America private client wealth advisors in its Wealth Management and Family Office Practice provided the following services to Rothman:

     (a)   data aggregation and reporting;

     (b)   investment advice;

     (c)   investment strategies;

     (d)   advice regarding money management and diversification of Rothman's investment portfolio; and

     (e)    curated private investment opportunities.

23.    As part of these services, Defendants represented to Rothman that Defendants would provide Rothman access to non-public offerings, vetted and made available by Defendants, as a result of Bank of America's "breadth in both public and private markets."

24.    Through its advisory relationship with Rothman, Defendants became aware that Rothman could have an interest in investing in a professional sports franchise.

25.    By 2002, Defendants had presented Rothman with several non-public opportunities to purchase ownership interests in professional sports franchises

affiliated with leagues such as the National Hockey League and National Football League (hereinafter "NFL").

### NFL Franchise Investment Proposed to Rothman by Bank of America

26.     Since 1998, Bank of America Corporation, as well as its affiliated entities, has continuously referred to Elliot McCabe, (hereinafter "McCabe") as the Managing Director of Bank of America's Sports Finance & Advisory Group. Additionally, McCabe has been a registered broker with Banc of America Securities, LLC, MLFPS and BoA Securities.

27.     At all times referenced herein, McCabe was acting within the course and scope of his employment with Bank America Corporation and its affiliated entities including, but not limited to, BofA Securities and MLFPS.

28.     In 2003, McCabe, along with other individuals acting on behalf of Defendants, approached Rothman with an investment opportunity in the Franchise.

29.     Soon thereafter, McCabe arranged a meeting between Rothman and the principal owner of the Franchise, Daniel Snyder (hereinafter "Snyder").

30.     During Rothman's due diligence process and thereafter, McCabe, along with other individuals acting on behalf of Defendants, advised Rothman in all matters pertaining to Rothman's contemplated investment in the Franchise.

31.     With the advice and assistance of Defendants, Rothman purchased ten percent (10%) of the Franchise for $75 million dollars, with a portion of the purchase financed by Bank of America N.A., subject to approval by the NFL.

32.     As part of the transaction, Defendants, by and through their agents, employees and related entities, provided Rothman with a lending apparatus, acted as his "private client advisor," and assumed the role of Rothman's "Administrative Agent and Personal Lender."

33.     Throughout this transaction and continuing thereafter, McCabe, in conjunction with other employees and agents acting on behalf of Defendants, advised Rothman on matters relating to the NFL, including, but not limited to, required financing and various approvals required by the NFL.

34.     In August of 2003, the NFL approved Rothman's purchase of 10% of the Franchise.

### *The Washington Commanders Franchise*

35.     The closely held corporate entity that managed the Franchise was known as Washington Football, Inc. (hereinafter "WFI").

36.     As part of Rothman's 10% acquisition, the WFI shareholders executed an Amended and Restated Stockholders Agreement (hereinafter "ARSA") which described the rights and responsibilities of the WFI shareholders.

37.     Rothman's Bank of America private client advisor and McCabe advocated that Rothman purchase a 10% ownership stake in the Franchise because, among other things, 10% owners were guaranteed a WFI Board seat.

38.     Rothman's 10% ownership stake in WFI also provided Rothman a Board seat on each of WFI's corporate subsidiaries: WFI Group, Inc., Redskins Park, Inc., WFI Stadium Inc. and Pro-Football Inc. (hereinafter "PFI").

39.     In March of 2005, then minority owner, Fred Drasner, (hereinafter "Drasner"), offered to sell his 10% ownership interest in the Franchise to fellow minority owners Rothman and Dwight Schar (hereinafter "Schar").

40.     Through a series of discussions involving Rothman, Rothman's Bank of America Wealth Management and Family Office private advisor and McCabe, Rothman purchased one-half of Drasner's shares for $34 million dollars.

41.     Pursuant to the advice of McCabe and others acting on behalf of Defendants, Rothman consolidated the debt related to his total investment in the Franchise with Bank of America, N.A. In total, Rothman had invested $109 million in the Franchise and was eventually indebted to Bank of America N.A. in the amount of $75 million dollars.  This indebtedness was subsequently increased to $100 million dollars.

42.     Following the Drasner sale, WFI's shareholders executed the Second Amended and Restated Stockholders Agreement, (hereinafter "2nd ARSA"), on March 31, 2005.

43.   The 2nd ARSA documented the Franchise ownership structure as follows:

    (a)   Rothman – 15.168%;

    (b)   Schar – 15.168%;

    (c)   Fred Smith (hereinafter "Smith") – 10.163%; and

    (d)   Snyder and the Snyder family – 59.5%.

44.   The Drasner sale resulted in WFI being managed by a Board of six directors: Rothman, Schar, Smith, Snyder and two members of the Snyder family. At the time of the Drasner sale, Rothman, his Bank of America Family Office advisor and McCabe openly discussed the significance with Rothman of the minority owners having Board representation equal to Snyder and his family.

45.   In December of 2019 and into early 2020, Rothman, Schar and Smith were provided with financial information and statements from the Franchise which suggested that Snyder was: (i) improperly taking corporate action without required board approval, (ii) mismanaging Franchise assets, and (iii) self-dealing.

### *The 2018 Bank of America Loan*

46.   One such improper activity occurred when Snyder caused the Franchise to obtain a $55 million loan from Defendants, (hereinafter "2018 Loan"), notwithstanding the fact that Defendants and other named and unnamed co-conspirators knew or should have known at the time that the Franchise Board of Directors had not approved the 2018 Loan.

47.    On or about November 16, 2018, Bank of America, N.A. agreed with Snyder and the Franchise to act as the sole administrative agent for the 2018 Loan and MLFPS agreed to act as sole lead arranger and sole bookrunner for the 2018 Loan.

48.    On November 16, 2018, Stephen Choi, Chief Financial Officer of the Commanders, (hereinafter "Choi"), accepted and agreed to the terms of the 2018 Loan Commitment Letter on behalf of Franchise subsidiary PFI.

49.    Paragraph Four of the Commitment Letter issued to PFI provided in pertinent part:

> [Y]ou [PFI] represent, warrant and covenant that (a) all financial projections concerning the Borrower and its subsidiaries that have been or are hereafter made available to Bank of America, MLPFS or the Lenders by you or any of your representatives (or on your or their behalf) in connection with this Senior Credit Facility (the "*Projections*") have been or will be prepared in good faith based upon reasonable assumptions and (b) all information, other than Projections, which have been or is hereafter made available to Bank of America, MLPFS or the Lenders by you or any of your representatives (or on your or their behalf) in connection with this Security Credit Facility, as and when furnished, is and will be complete and correct in all material aspects and *does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading. You agree to furnish us with further and supplemental information from time to time until the date of the initial borrowing under the Senior Credit Facility (the "Closing Date")* so that the representation, warranty, and covenant in the immediately preceding sentence are correct on the Closing Date as if the information were being furnished, and such representation, warranty and covenant were being made, on such date.

(Emphasis added).

50.    Madison B. Wyche, IV signed the Commitment Letter on behalf of both Bank of America, N.A. and MLPFS.

51.     At that time, Defendants and other named and unnamed co-conspirators knew or should have known that the owners of the Franchise had executed the 2nd ARSA which specified in Section 4(iii) that approval "of the applicable Board" is necessary for *WFI and the Subsidiaries* to "borrow money directly or through one or more Subsidiaries," unless the amount borrowed was less than $20 million.

52.     With that knowledge, attorneys for the Defendants began emailing Choi on or about November 29, 2018 seeking Franchise corporate documents necessary to close the 2018 Loan, which included, but was not limited to, delivery by the Franchise of written Board of Directors Resolutions approving the 2018 Loan.

53.     On December 3, 2018, the law firm for Defendants renewed its request for the Franchise's Corporate Board Resolutions.

54.     Thereafter, Choi requested that Defendants delay the 2018 Loan closing until December 7, 2018.

55.     On December 13, 2018, Choi sent an email to an attorney for the Defendants stating, "I would like to close [the 2018 Loan] today 12/13 but I still need the league to execute the consent letter. I will reach out this morning. Thanks."

56.     On December 13, 2018, Choi forwarded the Secretary's Certificate on behalf of the Franchise which stated, "[a]ttached hereto as Exhibit C is a true, correct and complete copy of resolutions duly adopted by the board of directors of the Company authorizing the performance of the transactions contemplated by the 2018 Loan."

57.    Contrary to the representations of Choi, no signed Corporate Board Resolutions were attached to the Secretary's Certificate because no such resolutions existed as the 2018 Loan was intentionally concealed from Rothman, Schar and Smith.

58.    Also on December 13, 2018, Eric Schaffer, Senior Vice President of Football Operations/General Counsel of the Commanders wrote an opinion letter to Defendants in which he stated he had examined the Resolutions of the Board of Directors authorizing the 2018 Loan.

59.    On December 13, 2018, an attorney for Defendants once again emailed Choi regarding the 2018 Loan and asked, "Do you have the resolutions you could send us? Those need to be attached to the officer closing certificate…"

60.    Nonetheless, Defendants closed the 2018 Loan even though Defendants had not obtained the required Resolutions evidencing approval by the Franchise Board of Directors.

61.    On January 8, 2019, Defendants' attorney emailed Choi requesting originals of the opinion letter and Secretary's Certificate that evidenced the purported Board Resolutions.

62.    Choi promptly responded on January 8, 2019, that he "will get the originals to [counsel] on Monday."

63.    Despite these additional representations, no Franchise Board Resolutions authorizing the 2018 Loan were produced by the Franchise, and Rothman, Schar and Smith were not made aware of the 2018 Loan prior to closing.

64.    At the time the 2018 Loan closed, Defendants and other named and unnamed co-conspirators knew or should have known that individuals acting on behalf of the Franchise had made false representations in order to secure the 2018 Loan proceeds, and in doing so, Defendants and others violated the terms of their own lending requirements and aided and abetted blatant violations of the terms of the 2nd ARSA by Snyder, the Franchise, and other named and unnamed co-conspirators.

65.    Defendants and other named and unnamed co-conspirators failed to notify Rothman of the Franchise's improper conduct prior to or after closing the 2018 Loan even though Rothman was a client of Defendants' Wealth Management and Family Office Practice, an owner of the Franchise, and a member of all Franchise Boards.

66.    Defendants and other named and unnamed co-conspirators, with full knowledge that the Board of Directors' Resolutions had never been delivered to Defendants, nevertheless approved and funded the 2018 Loan to PFI which thereby allowed the bad actors to disguise improper financial dealings, cash flow problems, and internal Franchise self-dealing to the financial detriment of Rothman.

### *Culpable Conduct of the Bank*

67.     In early 2020, Snyder informed the other Franchise owners of the potential need for additional capital which Snyder claimed was induced by the COVID-19 pandemic.

68.     In response, Rothman suggested that the Franchise borrow approximately $50 million dollars which should have been available to the Franchise pursuant to the NFL's rules regarding a Franchise's "debt ceiling."

69.     At the time of Rothman's suggestion, Rothman, Schar and Smith were all unaware of the 2018 Loan and, also, unaware that Snyder and the Franchise had already utilized all outstanding credit available to the Franchise.

70.     In early 2020, the lack of available credit for the Franchise, exposed improper financial dealings, including but not limited to, misuse of Franchise funds.

71.     In May of 2020, WFI confirmed that the Franchise would not pay the first quarter distributions to Rothman, Schar and Smith and that the Franchise would cease further distributions effective April 30, 2020.

72.     Consequently, Rothman discussed with McCabe and others acting on behalf of Defendants the significance of the lack of Franchise distributions as they pertained to the payment of Rothman's $100 million loan owed to Bank of America, N.A., which was renewed annually at the discretion of the Defendants.

73.   Although the distributions to Rothman ceased, the Franchise paid millions of dollars for Snyder's personal expenses which included:

    (a)   Snyder's personal airplanes, compensation for the flight crews and other personal expenses related to owning and operating those aircraft;

    (b)   self-dealing marketing or "advertising fees" of approximately $3 million dollars per year for display of the Franchise logo on Snyder's personal aircraft; and

    (c)   more than $7 million in expenses from 2017 through 2020 for Snyder's yacht(s), residential properties, personal staff, automobiles, and other personal entertainment and lifestyle expenses.

74.   On or about June 17, 2020, Rothman, Schar and Smith requested from Snyder information pertaining to the 2018 Loan and other perceived financial irregularities relating to the Franchise.

75.   Rather than providing information, Snyder attempted to remove Rothman, Schar and Smith from the Franchise Boards.

76.   As a result of Snyder's conduct and his failure to substantively respond to the minority owners' request for information, Rothman, Schar and Smith filed for Arbitration pursuant to the NFL rules and/or bylaws.

77.    Additionally, Rothman, Schar and Smith, by and through legal counsel, sought from Defendants all documents and communications that related to the 2018 Loan.

78.    Despite the minority owners' entitlement to this information, Defendants informed Rothman's attorney that "Bank of America" would not voluntarily produce any of the requested documents absent a subpoena or court order.

79.    Defendants refused to provide this information because Defendants knew that the production of this information would expose the improprieties related to the 2018 Loan.

80.    When Rothman's attorney sought to depose a corporate officer of the Franchise who had knowledge of the 2018 Loan, that corporate officer became "unavailable" for deposition.

81.    Rothman was told by a former Franchise employee that the "unavailable" corporate officer was recently paid $250,000.00 in severance compensation even though Snyder previously told Rothman that this corporate officer would not be paid any severance.

### The End Game

82.    Throughout the entirety of Rothman's dealings with Defendants, Defendants knew or should have known that Rothman relied upon Defendants, including, but

not limited to, McCabe and other agents and employees of Defendants as his advisors, bankers and confidants.

83.     In a June 21, 2020 email, Rothman shared his personal thoughts with McCabe regarding valuation of his ownership interest in the Franchise.

84.     Instead of a response from McCabe, on June 23, 2020, Snyder's attorney, Jonathan Shapiro, (hereinafter "Shapiro"), replied to Rothman's email to McCabe and wrote that McCabe was "literally dumbfounded" and "stunned" by Rothman's proposal, "which also made no sense to Snyder."

85.     This email response surprised Rothman because Rothman had never authorized McCabe to disclose Rothman's personal and confidential thoughts to Snyder or Snyder's lawyers, and certainly not at a time when McCabe knew the dispute between Rothman and Snyder could result in litigation.

86.     Shapiro further wrote in the email that, "Snyder and Bank of America as his advisor cannot pursue, for himself or by reaching out to third parties who otherwise potentially might be interested, the purchase of any individual minority non-voting interests on the illogical basis proposed by Rothman."

87.     As a client of Defendants, Rothman continuously believed, understood, expected and relied upon Defendants, to provide Rothman with honest and truthful advice, free of bias and conflict.

88.    Rothman, Schar, and Smith did not object to McCabe's participation as an advisor to Snyder as they understood McCabe's role was to provide Snyder with lending scenarios for the purchase of their respective interests in the Franchise in the event a settlement was reached.

89.    In October 2020, Rothman, Schar and Smith advised Snyder that they had received an "unvetted" offer from a third-party to purchase their combined 40% interest.

90.    In response, Snyder blocked all negotiations pertaining to this third party offer by prohibiting the exchange of due diligence materials between the potential buyer and Rothman, Schar and Smith.

91.    In response to Snyder's actions, Rothman, Schar and Smith filed suit on November 13, 2020, in the United States District Court for the District of Maryland. The case was captioned as *Robert Rothman, et al. v. Daniel Snyder,* Case No. 8:20-cv-03290-PJM, (hereinafter the "Maryland Action").

92.    The Maryland Action sought injunctive relief barring Snyder from interfering with due diligence and negotiations regarding the sale of a minority interest in the Franchise.

93.    Snyder and Defendants knew that Rothman would gain access to materials related to the 2018 Loan through the Maryland Action in spite of Defendants' previous refusal to produce such information for the Arbitration.

94.    During this process, Snyder privately and publicly commented that nobody can "f—k with me" as Snyder insinuated that he would use the "dirt" that he had accumulated on individuals including, but not limited to, NFL owners, the NFL Commissioner and other business people associated with the NFL.

95.    The parties to the Maryland Action agreed to participate in a virtual mediation on January 13, 2021.

96.    NFL Commissioner Roger Goodell, (hereinafter "Goodell"), served as the mediator and attended the proceedings with Jeffrey Pash, (hereinafter "Pash"), the NFL's General Counsel and Executive Vice President.

97.    Prior to the mediation, Rothman was informed that McCabe would participate in the mediation along with Snyder.

98.    Rothman still believed that McCabe, as Managing Director of Bank of America's Sports Finance and Advisory Group, attended the mediation in order to provide Snyder with potential lending scenarios in the event an agreement was reached for the sale and purchase of Rothman's ownership interest in the Franchise.

99.    Based upon over twenty-five (25) years of financial services provided to Rothman by McCabe and other individuals acting on behalf of Defendants, Rothman reasonably believed McCabe would not scheme with Snyder on behalf of Defendants to the detriment of Rothman, by putting the financial interests of Snyder or Defendants above those of Rothman.

100.   Defendants never provided Rothman with a disclosure of their actual and potential conflicts that resulted from the Defendants' role and participation in the ongoing negotiation process.

101.   The mediation began on January 13, 2021, and it ended the following day without a resolution.

102.   Thereafter, intermittent discussions occurred between and among the NFL, Snyder's lawyers, and legal counsel for the minority owners regarding the potential sale of their minority interests.

103.   During this time, McCabe maintained that Rothman's shares in the Franchise were "non-voting," subject to a "deep minority discount," and that the entire enterprise value of the Franchise was less than $3.0 billion.

104.   McCabe, through others, represented to Rothman that Snyder had no plan to sell the Franchise even after acquiring some or all of the minority shares from Rothman, Schar and Smith.

105.   McCabe, and other agents and employees of Defendants, knew or should have known that Snyder was not financially capable of servicing the debt associated with the buyout of the minority owners when coupled with the expense arising from Snyder's personal lifestyle.

106.   McCabe, along with other agents and employees of Defendants, intentionally withheld information regarding Snyder's financial circumstances from Rothman

because Rothman would have refused to sell his 15.168% stake in the Franchise if Rothman was aware of Snyder's financial position.

107.   McCabe, and other agents and employees of Defendants, were aware that Rothman advocated for the use or engagement of investment banking institutions other than of Bank of America as it pertained to the marketing and potential sale of the Franchise shares owned by Rothman, Schar and Smith.

108.   With the assistance and cooperation of Defendants, Snyder refused to provide financial information, interfered with due diligence, and blocked the involvement of other investment banks in order to impede Rothman's ability to obtain the true market value of Rothman's ownership stake in the Franchise.

109.   Snyder's corporate improprieties coupled with the actions of the Defendants, including not limited to, improper financial dealings with Snyder and the Franchise, and the insinuation that the lack of Franchise distributions may cause Defendants to call Rothman's annually renewable loan with Bank of America N.A., forced Rothman to sell his Franchise shares below market value.

110.   On April 2, 2021, Rothman, Schar and Smith agreed to sell their collective interests in the Franchise to Snyder for $875 million dollars.

111.   With knowledge of the previous corporate improprieties related to the 2018 Loan, including but not limited to, mail and wire fraud, Defendants provided the

necessary lending apparatus to Snyder so that he could purchase the shares of Rothman, Schar and Smith.

### *Defendants' Profit from Snyder's Sale of the Washington Commanders*

112.   Despite Defendants' assertion that Snyder had no plan to sell the Franchise, on November 2, 2022 Snyder announced that he had hired Bank of America/BofA Securities to market and sell the Franchise.[8] The press release appeared as follows:



**WASHINGTON COMMANDERS HIRE BofA SECURITIES TO CONSIDER POTENTIAL TRANSACTIONS**

ASHBURN, Va., November 2, 2022 -- Dan and Tanya Snyder and the Washington Commanders announced today that they have hired BofA Securities to consider potential transactions.

The Snyders remain committed to the team, all of its employees and its countless fans to putting the best product on the field and continuing the work to set the gold standard for workplaces in the NFL.

**– Washington Commanders est. 1932 –**

---

[8] https://www.nfl.com/news/commanders-hire-bank-of-america-securities-to-explore-potentially-selling-team

113.   The press release that announced Snyder's intention to market and sell the Franchise with Bank of America/BofA Securities as the lead investment bank exposed the concerted efforts between Defendants, Snyder, and other named and unnamed co-conspirators to obtain all of the minority shares at a discounted price prior to publishing such announcement.

114.   The sale of the Franchise in May of 2023 for $6.05 billion was the culmination of Defendants' and Snyder's conspiratorial conduct.

115.   Because Snyder had a reliable and complicit financial relationship with Defendants and because Defendants chose to put their collective financial interests above the interests of Rothman, the Defendants and Snyder were able to conduct business in an illegal and improper manner to the financial detriment of Rothman.

116.   Defendants ignored federal banking laws, financial red flags, and controlling corporate governance while concealing or turning a blind eye to other activities, all of which aided and abetted the improper and illegal diversion of money from the Franchise in a manner that diminished or eliminated monetary distributions which otherwise would have been made to Rothman.

117.   As a result of Defendants' failure to institute and enforce proper corporate conduct and oversight for its employees, Snyder was able to cultivate improper relationships with Defendants, including, but not limited to, McCabe and other agents and employees, which allowed Snyder to improperly and illegally divert

significant Franchise funds for his own personal uses to the financial detriment of Rothman.

118.   Defendants ignored Snyder's improper and illegal dealings since Defendants knew or reasonably anticipated that Snyder would have to sell the Franchise as a result of Snyder's indebtedness.

119.   Defendants intentionally concealed, or at a minimum negligently failed to disclose, such activities to Rothman in order to solidify and maintain Defendants' business relationship(s) with Snyder and the NFL.

120.   Defendants' actions allowed them to charge substantial fees, make significant profits, and garner great notoriety and market cache by being the lead investment bank for the sale of the Franchise.

121.    Defendants acted knowingly and willfully with the understanding that Rothman would suffer significant financial harm as a result of their actions.

### <u>COUNT I</u>
### (Defendants' Breaches of the Fiduciary Duties Owed to Rothman)

122.   Rothman realleges and incorporates herein paragraphs 1 through 121 of this Complaint, including all subparts, as if expressly rewritten herein.

123.   At all times relevant to this Complaint, the actions of Defendants created a fiduciary relationship between Rothman and Defendants, as Defendants knew that Rothman relied upon Defendants to advise him on various financial matters.

124. Defendants, by and through McCabe and other individuals acting on behalf of Defendants, provided Rothman with financial advice, investment and business recommendations and valuation opinions regarding the Franchise while Rothman was a client of Bank of America Corporation's "Wealth Management and Family Office Practice."

125. Defendants, by and through their authorized officers, directors, agents and employees, breached the fiduciary duties they owed to Rothman, including, but not limited to, the following:

    (a)   failing to notify or inform Rothman regarding the 2018 Loan;

    (b)   closing the 2018 Loan;

    (c)   failing to provide honest advice to Rothman as to the value of Rothman's shares in the Franchise;

    (d)   intentionally disclosing Rothman's personal and confidential thoughts regarding the value of Rothman's shares in the Franchise to Snyder and Snyder's lawyers;

    (e)   advocating that Rothman's shares in the Franchise were subject to a deep minority discount; and

    (f)   collectively placing their own financial interests ahead of Rothman's in the face of potential or actual conflicts of interest.

126.   As a direct and proximate result of Defendants' breaches of the fiduciary duties owed to Rothman, Rothman has suffered significant monetary loss within the State of Florida.

## COUNT II
### (Florida Civil Remedies for Criminal Practices Act)

127.   Rothman realleges and incorporates herein paragraphs 1 through 121 of this Complaint, including all subparts, as if expressly rewritten herein.

128.   At all times relevant to this Complaint, Bank of America Corporation, Bank of America, N.A., MLFPS, BofA Securities and U.S. Trust, along with other co-conspirators, constituted an ongoing group of persons or entities associated in fact, and together constituted an "enterprise" as defined in Fla. Stat. § 772.102(3), (hereinafter the "BofA Enterprise").

129.   At all times relevant to this Complaint, Defendants Bank of America Corporation, Bank of America, N.A., MLPFS, BofA Securities and U.S. Trust, along with other named and unnamed co-conspirators, are or were members of, and affiliated directly or indirectly with, the BofA Enterprise.

130.   Defendants, as members of the BofA Enterprise engaged in a pattern of criminal activity consisting of two or more separate and distinct incidents of criminal activity. The members of the BofA Enterprise engaged in this pattern of criminal activity over several years and in connection with numerous similar transactions.

131.   As part of the conspiracy, the members of the BofA Enterprise conspired to commit and/or committed at least fourteen (14) predicate acts, including but not limited to:

(a)   closing the unauthorized 2018 Loan based upon materially false, misleading and fraudulent PFI corporate documents and misrepresentations in violation of 18 U.S.C. § 1341 and Fla. Stat. § 817.54;

(b)   transferring monies connected to the unauthorized 2018 Loan with knowledge of materially false, misleading and fraudulent PFI corporate documents, in violation of 18 U.S.C. § 1343;

(c)   paying a former Franchise officer with knowledge of the 2018 Loan $250,000 in "severance" who thereafter became "unavailable" in violation of 18 U.S.C. § 1512, Fla. Stat. § 914.22 and 18 U.S.C. § 201;

(d)   taking security deposits from Franchise season ticket holders' dormant accounts and diverting the monies for Snyder's benefit, in violation of Fla. Stat. § 812.014 and 18 U.S.C. § 1343;

(e)   paying a Franchise employee who had knowledge of the diversion of security deposit monies six (6) times the amount initially offered to "silence" the employee, in violation of 18 U.S.C. § 1512, Fla. Stat. § 914.22 and 18 U.S.C. § 201;

(f)   leaking emails involving family members, friends and personal issues of a Franchise officer on the eve of that officer's Congressional testimony to influence the officer's testimony, in violation of 18 U.S.C. § 1512 and Fla. Stat. § 914.22;

(g)   extorting or threatening to extort other NFL owners, the NFL Commissioner, and/or other business people associated with the NFL by stating nobody could "f---k with me" because the BofA Enterprise would use the "dirt" that Snyder accumulated, in violation of 18 U.S.C. § 1512, Fla. Stat. § 914.22 and Fla. Stat. § 836.05;

(h)   making false entries in the corporate books of WFI and its subsidiaries with the intent to defraud Rothman, the NFL, ticket holders and others in violation of Fla. Stat. § 817.15;

(i)   transmitting Franchise financial information which contained fraudulent entries contained therein intending to defraud Rothman, the NFL, ticket holders and others in violation 18 U.S.C. § 1341;

(j)   willfully failing to report suspicious transactions relevant to possible violations of law or regulations, as required by the Secretary of Treasury pertaining to the 2018 Loan in violation of 31 U.S.C. §§ 5318(g) and 5322(a); and 12 C.F.R. § 21.11;

(k)  willfully failing to enact adequate policies, procedures and controls to ensure that information in connection with the 2018 Loan was shared with United States compliance and anti-money laundering personnel in violation of 31 U.S.C. §§ 5318(h) and 5322(a); and 12 C.F.R. § 21.21;

(l)  knowingly engaging in monetary transactions with property derived from criminal acts affiliated with the BofA Enterprise in violation of 18 U.S.C. § 1957;

(m)  making the 2018 Loan proceeds available to the Franchise with the knowledge that the documents provided to Defendants were fraudulent, materially false, and misleading while also fraudulently concealing information from Rothman and the other minority owners in violation of Fla. Stat. § 843.14; and,

(n)  knowingly concealing the BofA Enterprise's criminal activity, in violation Fla. Stat. § 843.14.

132.   The incidents of criminal activity described above have the same or similar intents in their purpose which was to enrich the members of the BofA Enterprise, at the expense of Rothman.

133.   The incidents of criminal activity described above which span from 2018 to May of 2023 are interrelated by distinguishing characteristics and are not isolated incidents. The incidents involve the same or similar methods of commission, the

same or similar benefits to the members of the BofA Enterprise, and the same or similar financial injuries to Rothman.

134.   As a direct and proximate result of the BofA Enterprise's separate and distinct predicate acts and racketeering activity in violation of Fla. Stat. § 772, *et seq.,* the members of the BofA Enterprise were enriched and Rothman suffered significant monetary loss, exposure to civil liability to third parties, exposure pertaining to his own financial covenants with lenders and loss of goodwill.

135.   Pursuant to Fla. Stat. § 772.104(1), Rothman is entitled to treble damages of any and all actual damages proven.

136.   Pursuant to Fla. Stat. § 772.185, Rothman is entitled to recover the reasonable attorney's fees which he has incurred in pursuing this claim.

## COUNT III
### (Civil RICO, 18 U.S.C. § 1962, *et seq.*)

137.   Rothman realleges and incorporates herein paragraphs 1 through 121 of this Complaint, including all subparts, as if expressly rewritten herein.

138.   At all times relevant to this Complaint, Defendants Bank of America Corporation, Bank of America, N.A., MLPFS, BofA Securities and U.S. Trust, along with other co-conspirators, constituted an "enterprise," as defined under 18 U.S.C. § 1961(4), (hereinafter the "BofA Enterprise") are or were members affiliated directly or indirectly with the BofA Enterprise.

139.   At all times relevant to this Complaint, Defendants Bank of America Corporation, Bank of America, N.A., MLPFS, BofA Securities and U.S. Trust, along with other named and unnamed co-conspirators, are or were members affiliated directly or indirectly with, the BofA Enterprise.

140.   The BofA Enterprise affected interstate commerce through commercial lending, financing and sale of corporate interests, and through engaging in multiple transactions with a Franchise of the NFL, and the various ownership interests in the Franchise.

141.   As part of the conspiracy, the members of the BofA Enterprise conspired to commit and/or committed at least eleven (11) predicate acts including, but not limited to, the following:

     (a)   closing the unauthorized 2018 Loan based upon materially false, misleading, and fraudulent PFI corporate documents, in violation of 18 U.S.C. § 1341;

     (b)   transferring monies connected to the unauthorized 2018 Loan with knowledge of materially false, misleading and fraudulent PFI corporate documents in violation of 18 U.S.C. § 1343;

     (c)   transmitting Franchise financial information which contained fraudulent entries with the intent to defraud Rothman, the NFL, ticket holders and others in violation 18 U.S.C. § 1341;

(d)  willfully failing to report suspicious transactions relevant to a possible

violations of law or regulations, as required by the Secretary of

Treasury pertaining to the 2018 Loan in violation of 31 U.S.C. §§

5318(g) and 5322(a); and 12 C.F.R. § 21.11.

(e)  willfully failing to enact adequate policies, procedures and controls to

ensure that information in connection with the 2018 Loan was shared

with United States compliance and anti-money laundering personnel in

violation of 31 U.S.C. §§ 5318(h) and 5322(a); and 12 C.F.R. § 21.21.

(f)  taking security deposits from Franchise season ticket holders' dormant

accounts and diverting the monies for Snyder's benefit, in violation of

18 U.S.C. § 1343;

(g)  paying a Franchise employee who was knowledgeable of the diversion

of security deposit monies six (6) times the amount of severance

initially offered to "silence" the employee, in violation of 18 U.S.C.

§1512 and 18 U.S.C. § 201;

(h)  paying a Franchise officer with knowledge of the 2018 Loan $250,000

in "severance" and who thereafter became "unavailable" as a witness,

in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 201;

(i)  leaking emails involving family members, friends and personal issues

of a Franchise officer on the eve of that officer's Congressional

testimony to influence the officer's testimony, in violation of 18 U.S.C. § 1512;

(j)   extorting or threatening to extort other NFL owners, the NFL Commissioner, and/or other business people associated with the NFL by stating nobody could "f---k with me" because the BofA Enterprise would use the "dirt" that Snyder accumulated in violation of 18 U.S.C. § 1512; and,

(k)   knowingly engaging in monetary transactions with property derived from criminal acts affiliated with the BofA Enterprise in violation of 18. U.S.C. § 1957.

142.   As a direct and proximate result of the BofA Enterprise's separate and distinct predicate acts in violation of 18 U.S.C. § 1962, *et seq.*, the members of the BofA Enterprise were enriched and Rothman suffered significant monetary loss, exposure to civil liability to third parties, exposure pertaining to his own financial covenants with lenders and loss of goodwill.

143.   Pursuant to 18 U.S.C. § 1964(c), Rothman is entitled to recover threefold the damages he sustained and the cost of this suit, including reasonable attorney's fees.

## <u>COUNT IV</u>
### (Conspiracy by Coercion)

144.   Rothman realleges and incorporates herein paragraphs 1 through 121 of this Complaint, including all subparts, as if expressly rewritten herein.

145.   Defendants, by and through McCabe and along with other unnamed co-conspirators, all of which acted with malicious motive in concert either by express agreement or an agreement implied or understood from the conduct itself, including but not limited to, the refusal of Defendants and the NFL to investigate and take action against Snyder.

146.   Defendants and other named and unnamed co-conspirators, with malicious motive, coerced Rothman to sell his shares in the Franchise below market value by exerting economic influence in a manner that could not have been accomplished if each of the named and unnamed co-conspirators acted alone.

147.   Defendants, and other named and unnamed co-conspirators, had this peculiar and pronounced power collectively.

148.   In particular, Snyder procured the 2018 Loan without Board approval and withheld distributions from Rothman, Schar and Smith.

149.   Defendants knew the significance of the lack Franchise distributions to Rothman pertaining to his Franchise loan with Bank of America N.A.

150.   Defendants knew Snyder was greatly indebted to Bank of America, but Snyder was in control of the Franchise.

151.   Defendants, with that knowledge, had motive to be named the lead investment bank for the sale of the Franchise.

152.   Defendants, along with named and unnamed co-conspirators, committed wire fraud, mail fraud, refused to provide financial information, interfered with due diligence, blocked the involvement of other investment banks and committed corporate improprieties on behalf of the Franchise in a way that negatively impacted monetary distributions to Rothman, Schar and Smith.

153.   These activities, coupled with Defendants' insinuation that it may have to call Rothman's loan with Bank of America N.A. in the event that the Franchise would cease distributions to Rothman, forced Rothman to sell his Franchise shares below market value.

154.   As a result of the peculiar power exerted by the co-conspirators, Rothman was forced to sell his ownership stake in the Franchise at a deep discount.

155.   As a direct and proximate result of the conspiracy, Rothman has suffered significant monetary loss.

## COUNT V
### (Defendants' Aiding and Abetting Snyder's Breaches of Fiduciary Duties Owed to Rothman)

156.   Rothman realleges and incorporates herein paragraphs 1 through 121 of this Complaint, including all subparts, as if expressly rewritten herein.

157.   As the controlling owner of the Franchise, Snyder owed fiduciary duties to the minority owners, including, but not limited to, Rothman.

158.   At all times relevant to this Complaint, Defendants knew or should have known that Snyder owed these fiduciary duties to Rothman.

159.   Snyder owed fiduciary duties to Rothman until Rothman sold his shares in the Franchise on April 2, 2021. During the time in which Snyder owed these duties to Rothman, Snyder committed numerous breaches of these duties, including, but not limited to, the following:

(a)   self-dealing;

(b)   using Franchise money for his own personal benefit;

(c)   blocking the reasonable inspection of the corporate books, accounting records, and financial statements of the Franchise;

(d)   ignoring the requirements of corporate governance as set forth in the Franchise documents to his benefit in a manner that caused financial harm to the minority owners including, but not limited to, Rothman; and,

(e)   using the proceeds from the 2018 Loan to the Franchise to support his extravagant personal lifestyle.

160.   Defendants knew or should have known that closing the 2018 Loan without verifying Board approval aided and abetted the breaches of the fiduciary duties Snyder owed to Rothman.

161.   In March of 2019, Defendants allowed Snyder to draw $38,000,000.00 from the 2018 Loan proceeds without verifying Snyder had obtained Board approval.

162.   Defendants continuously allowed Snyder to draw down the proceeds from the 2018 Loan without verifying Snyder had obtained Board approval.

163.   The Defendants' substantial assistance to Snyder in regard to the 2018 Loan aided and abetted Snyder in breaching the fiduciary duties Snyder owed to Rothman.

164.   Defendants knowingly aided and abetted Snyder's breaches of the fiduciary duties owed to Rothman.

165.   Defendants' provided Snyder with substantial assistance with Snyder's breaches of his fiduciary duties, by purposefully refusing to provide Rothman with documents and communications related to the 2018 Loan, despite being fully aware of Rothman's legal right to inspect said documents.

166.   In further substantial assistance of Snyder's breaches of his fiduciary duties, Defendants disregarded federal law and their own internal procedures, policies and/or controls which were not sufficient to ensure proper anti-money laundering compliance pertaining to the 2018 Loan.

167.   As a direct and proximate result of the Defendants' actions in aiding and abetting the breaches of the fiduciary duties owed by Snyder to the minority owners, including, but not limited to, Rothman, Rothman has suffered significant monetary loss.

## COUNT VI
### (Negligent Misrepresentation)

168.   Rothman realleges and incorporates herein paragraphs 1 through 121 of this Complaint, including all subparts, as if expressly rewritten herein.

169.   Throughout the events alleged herein, Defendants, by and through McCabe and other employees and agents, made misrepresentations of material fact to Rothman including, but not limited to, the value of Rothman's minority shares in the Franchise.

170.   Defendants, by and through McCabe and other employees and agents, should have reasonably known that the above-referenced misrepresentations contained false statements of material fact.

171.   McCabe, and other agents and employees of Defendants, negligently represented to Rothman material misinformation on Defendants' behalf regarding the value of Rothman's minority ownership shares for the purposes of inducing Rothman to rely on the statements.

172.   Rothman acted in justifiable reliance upon the misrepresentations made by McCabe and other agents and employees acting on behalf of Defendants.

173.   As a direct and proximate result of the negligent misrepresentations of Defendants, Rothman has suffered significant monetary loss.

## COUNT VII
### (Negligence)

174.   Rothman realleges and incorporates herein paragraphs 1 through 121 of this Complaint, including all subparts, as if expressly rewritten herein.

175.   Defendants, by and through McCabe and other employees and agents, owed Rothman a duty of ordinary and reasonable care applicable to banks and financial institutions.

176.   Defendants breached their duty of care to Rothman by, among other things, failing to provide advice to Rothman which was free of bias and conflict as to the value of Rothman's shares in the Franchise.

177.   Defendants' failure to disclose key financial information that they possessed and Defendants' failure to disclose to Rothman that their advice was compromised caused Rothman to make decisions pertaining to his interests in the Franchise without key information.

178.   As a direct and proximate result of Defendants' negligence, Rothman has suffered significant monetary loss.

## PRAYER FOR RELIEF

WHEREFORE, in consideration of the foregoing, Robert Rothman respectfully requests that judgment be entered in his favor against the Defendants, jointly and severally, for the following relief:

a. Compensatory damages in an amount in excess of $75,000.00, including where applicable treble damages;

b. Pre-judgment interest to the maximum extent provided by applicable law;

c. Post-judgment interest;

d. Attorney's fees and expenses of litigation; and,

e. Any other relief the Court deems just and fair.

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38, Rothman demands a trial by jury as to all claims so triable.

Dated: December 27, 2023.

Respectfully submitted,

*/s/ Brian P. Kopp*

Brian P. Kopp
Florida Bar No. 104093
bkopp@bkmlaws.com
BETRAS, KOPP & MARKOTA, LLC
1408 N. Westshore Blvd. Suite 1020
Tampa, FL 33607
Office: (813) 333-9420

Douglas J. Titus, Jr.
Florida Bar No. 213756
dtitus@bkmlaws.com
BETRAS, KOPP & MARKOTA, LLC
1408 N. Westshore Blvd. Suite 1020
Tampa, FL 33607
Office: (813) 333-9420

James N. Melfi
Florida Bar No. 1023762
jmelfi@bkmlaws.com
BETRAS, KOPP & MARKOTA, LLC
1408 N. Westshore Blvd. Suite 1020
Tampa, FL 33607
Office: (813) 333-9420

*Attorneys for Plaintiff, Robert Rothman*