**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

Robert Rothman,

Plaintiff,

v. Case No: 8:23-CV-02969

Bank of America Corp., *et al.*,

Defendants.

---

# DEFENDANTS' RENEWED MOTION FOR THE SANCTION OF DISMISSAL OF PLAINTIFF'S CLAIMS FOR REPEATED DISCOVERY MISCONDUCT

Enu A. Mainigi, Lead Counsel *(Pro Hac Vice)*
David S. Blatt *(Pro Hac Vice)*
Joseph M. Terry *(Pro Hac Vice)*
Grant A. Geyerman *(Pro Hac Vice)*
Eden Schiffmann *(Pro Hac Vice)*
Allison S. Eisen *(Pro Hac Vice)*
Williams & Connolly LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
emainigi@wc.com
dblatt@wc.com
jterry@wc.com
ggeyerman@wc.com
eschiffmann@wc.com
aeisen@wc.com

Michael S. Hooker | FBN 330655
Phelps Dunbar LLP
100 South Ashley Drive, Suite 2000
Tampa, FL 33602
(813) 472-7866
Michael.Hooker@phelps.com

Pursuant to Federal Rules of Civil Procedure 37 and 41, Defendants (the "Bank") respectfully renew their motion asking the Court to dismiss Plaintiff Robert Rothman's claims as a sanction for Rothman's flagrant discovery misconduct and defiance of Court Orders, and the resulting prejudice to the Bank.

**SUPPORTING MEMORANDUM OF LAW**

For over a year, Rothman has defied this Court's Orders, flouted its deadlines, and treated his discovery obligations as obstacles to be circumvented rather than duties to be fulfilled. He has knowingly made misrepresentations to the Court, fabricated metadata, manufactured thousands of privilege claims, and manipulated privilege assertions to circumvent Court orders. And he strategically withheld among the most damaging documents until it was too late for the Bank to use them, producing them only after depositions had concluded, expert reports were exchanged, and summary judgment was briefed. The Court already has found Rothman's conduct arguably "uncandid" and "disingenuous," "not careful," not "diligent," and "frustrating," sanctioned him multiple times, and offered him numerous opportunities to correct course. Instead, he doubled down.

On April 3, 2026, the Court denied without prejudice the Bank's initial motion for terminal sanctions, holding it lacked sufficient information "at this time" to evaluate the materiality of Rothman's misconduct. ECF 252 at 3. The Court held that "should Defendants discover new evidence supporting Plaintiff's bad faith, they may renew their motion." *Id.* After multiple additional motions, a Special Master process that ended last week, and the production as recently as this

week of improperly withheld documents, such evidence now exists in spades. The Bank thus renews its motion.

## BACKGROUND

### A. Rothman's Serial Disregard of Deadlines and Court Orders

Discovery began in earnest on February 14, 2025, when the Bank served its first requests for production. *See* Eisen Declaration ("Decl.") ¶2. Rothman ignored his response deadline, thus waiving all objections to the RFPs. ECF 140 at 7-8.[1] Nor did he produce any documents by that deadline. Instead, he waited until April 16, 2025—one month late—to produce just 1,631 documents, consisting largely of communications with the Bank—*i.e.*, documents the Bank already had. Decl. ¶3. On May 22, 2025, he produced nine more documents. *Id.* ¶4.

The Bank conferred at length with Rothman to explain what documents it had requested, and Rothman repeatedly promised productions that never materialized. *Id.* ¶9. In July 2025, five months after the RFPs were served, Rothman finally agreed to collect responsive documents, including from his family members and former counsel. *Id.* ¶10. He also agreed to substantially complete his production by August 22 (four months before the close of fact discovery). *Id.*

In what was becoming a pattern, Rothman ignored that August 22 deadline. He made a small production on August 22, 2025, which was most notable for its omission of all documents from his family members, employees, and former

---

[1] Rothman attempted to circumvent this waiver by falsely representing at a hearing that he had obtained an extension for his responses and objections. ECF 140 at 7-8. The Court found Rothman's representation not credible. *Id.*

counsel. *Id.* ¶12. He produced only a few stray documents from a June 2020 arbitration, a November 2020 lawsuit, and a January 2021 mediation that culminated in the minority owners' sale of shares. And he had failed to produce key documents from his own files, including (1) his engagement letter with Moag & Company, which proved that Moag, not the Bank, was his sole and exclusive agent in the sale effort, (2) all communications with his co-minority owners relating to the 2021 sale, (3) all third-party offers he received for his shares, (4) the March 2, 2021 Settlement Agreement with Dan Snyder, and (5) the March 2, 2021 Stock Purchase Agreement accepting more than $327 million for his shares. *Id.*

On September 16, 2025, the Bank moved to compel production, including of documents responsive to many RFPs for which Rothman had produced nothing. ECF 116. On October 4, 2025, the Court found that Rothman had "waived opposition to many arguments raised by Defendants" by failing to oppose them and ordered Rothman to "make significant (if not complete) progress in producing responsive documents" "before the [next] hearing." ECF 128.

Rothman ignored that Order. Between October 4 and 14, he produced four documents—two of which the Bank had produced to him and he produced back with his own superimposed Bates stamp. Decl. ¶19. By this point—more than seven months after the Bank had served its discovery requests, and with the close of discovery (including depositions) two months away—Rothman had produced only about 10% of what he would eventually be ordered to produce.

On October 14, 2025, the Court heard argument on the Bank's motion to

compel. The Court observed that "it doesn't really look like a diligent attempt to comply with discovery obligations or frankly even the last court order," and not even a "court order was very effective" in persuading Rothman to comply. *Id.* ¶¶23-24. During the hearing, to forestall an order requiring production of mediation-related documents, Rothman's counsel thrice falsely represented that "we have no documents from the [2021] mediation." *Id.* ¶22. As explained below, it became clear after additional orders compelling production that Rothman's counsel had and was aware of critical, non-privileged documents created during the mediation.

The same day as it granted most of the Bank's motion from the bench, the Court ordered Rothman to begin "rolling productions" "within a week." ECF 134. On October 20, 2025, the Court granted the Bank's motion in full, found Rothman had waived all objections, and ordered production of all responsive documents by October 27, 2025. The Court also sanctioned Rothman and awarded fees. ECF 140 at 11-12. Instead of complying, on October 27, Rothman filed an Objection that challenged only the order to produce mediation materials and the Court's finding of waiver. ECF 144. Rothman did not seek a stay, but nonetheless continued withholding thousands of documents,[2] including documents from the arbitration and lawsuit Rothman had filed against Snyder in 2020, and text messages from key witnesses. ECF 146 at 8. Lacking these key materials, the Bank requested to extend fact discovery, which the Court granted on November 5, 2025. ECF 153.

[2] Rothman's counsel was aware that "[t]he filing of a Rule 72(a) objection does not automatically stay a magistrate judge's nondispositive order." ECF 380 at 2.

On January 23, 2026, the District Court overruled Rothman's objections. ECF 183. On January 28, 2026—with only three weeks left in the extended fact discovery period and after numerous depositions already had occurred—Rothman produced more than 14,300 documents, nearly tripling his total production. Decl. ¶50. This included pre-stamped documents from the arbitration that were production-ready since the Bank served its requests 11 months earlier, the Court ordered him to produce by October 27, 2025, and Rothman had withheld even though they were not subject to his Objection. *Id.*

Even that production, however, was incomplete. On February 13, 2026—four days before the extended fact-discovery close and after the Bank had deposed Rothman, his son, and his son-in-law—Rothman produced an additional 3,735 documents. *Id.* ¶62. This tranche contained many of the most important documents, including 79% of the documents in Rothman's possession relating to his lawsuit against Snyder (including the unredacted complaint) and 39% of documents in his possession relating to the arbitration. ECF 229-1 at 1, 6.

These tranches, which should have been produced (at the latest) on October 27 by Court Order, included devastating documents. For example, Rothman withheld until after his own deposition his affidavit from the 2020 arbitration admitting that [redacted] Decl. ¶62(c). And he withheld a letter to Roger Goodell in which he explained that [redacted]. *Id.* ¶62(d). These documents

fundamentally contradicted Rothman's claims and testimony that he relied on McCabe as his advisor and did not hire Moag to sell his shares in the Franchise.

### B. Rothman's Abusive Privilege Assertions

Since July 2025, the parties also have been mired in motions over Rothman's meritless, shifting privilege assertions. Through a painstaking process, and at enormous cost to the Bank, the Court found that Rothman wrongly asserted privilege over 18,000 of approximately 21,000 documents on his privilege log—an astonishing ~86% error rate and the result of intentional discovery abuse.

#### 1. Rothman Abused Privilege To Withhold Key Documents

Rothman weaponized privilege as a tactic from the outset. In July 2025, Rothman directed his public relations firm, Tucker/Hall, not to produce documents, forcing the Bank to litigate the meritless question of whether Rothman shared a privilege with his public relations firm. ECF 107. He did not, and the Court ordered Rothman to produce every single document. *Id.* at 11-14. In September 2025, Rothman claimed that merely divulging lawyers' names in response to interrogatories would violate privilege. Decl. ¶15. It would not, and the Court ordered him to provide those names. ECF 120. But the full extent of Rothman's privilege abuse only became clear when he produced his privilege logs.

On October 28, 2025, Rothman served a privilege log with more than 9,000 entries—excluding categorical entries—exceeding by multiples the total volume of documents he had produced. Decl. ¶31. He later represented to the Court that this log covered "21,646 privileged documents." ECF 229-1 at 11. In a single entry, for

example, Rothman withheld more than 12,000 documents related to the 2020 arbitration. Decl. ¶31. Another entry categorically asserted privilege over "[m]ediation documents." *Id.* On November 21, 2025, Rothman served a supplemental log that failed to remedy the errors the Bank identified on his initial log. Decl. ¶37. On December 9, the Bank moved to compel Rothman to produce the improperly logged documents. ECF 158. Rothman opposed and served a second supplemental log, altering only four of more than 9,000 entries and adding some metadata. Decl. ¶42.

On January 6, 2026, the Court found the Bank's assertions about the log "well-founded." ECF 167 at 2. The Court observed that "[m]any privilege log descriptions are vague" or led the Court "to question how the document could be privileged." *Id.* The Court ordered Rothman to cure the deficiencies and produce non-privileged documents by January 13, 2026. *Id.* Rothman did neither. Instead, on January 14—having already defaulted—Rothman filed another Objection, ECF 174, which the District Court construed as a motion for reconsideration, ECF 175.

On January 21, 2026, Judge Adams held that Rothman's revised privilege log "fails to provide sufficient information," "did not correct the overly vague descriptions" the Court had ordered him to correct, and "still contains entries that lead the Court to question how certain withheld documents could possibly be privileged." ECF 180 at 6-7. As "concern over the proper assertion of privilege persists," the Court again ordered Rothman to cure the defects and produce all non-privileged documents. *Id.* at 7. Rothman again refused to comply, forcing the

Bank again to move to compel compliance. ECF 200. In response, Rothman produced another supplemental log—his fifth. ECF 220-1.

After a three-hour hearing on March 6, 2026, the Court ordered Rothman to produce (i) all documents withheld based on a (now disproven) common legal interest between him, his son, and his son-in-law, (ii) all documents withheld based on a (now disproven) common legal interest with Schar Holdings, Black Diamond, or FedEx employees, and (iii) his opening statement from the January 2021 mediation with Snyder. ECF 233. The Court thereafter ordered production of documents sent via Fred Smith's FedEx email address, finding Smith's use of a corporate address broke any purported privilege. ECF 239.

Between March 13 and March 20, 2026, nearly a month after fact discovery closed, Rothman produced 3,161 more documents that he improperly had withheld, including highly material evidence the Bank could not use in fact discovery—and with no time to incorporate effectively into expert reports due on March 16, 2026. Decl. ¶¶70-73. For example:

- ***McCabe.*** Rothman's case hinges on his claim that Bank employee Elliott McCabe misled Rothman during a June 14, 2020 telephone call by presenting himself as neutral rather than as an advocate for Snyder. *See* ECF 328 ¶¶103-09. Rothman finally produced the smoking gun: a contemporaneous email one day after the call where Rothman [redacted]. Decl. ¶70(d).[3] Rothman also produced a June 28, 2020 letter confirming [redacted] *Id.* ¶73(c).

[3] This is Rothman's most contemporaneous account of his call with McCabe; Rothman testified that he intentionally destroyed his notes of the conversation. Ex. 3 at 107.

- ***Intent to Sell.*** Rothman belatedly produced documents regarding his intent to sell his shares in 2020, including evidence [redacted] *E.g.*, *id.* ¶70(f). This directly contradicts Rothman's testimony that he [redacted]. Ex. 3 at 267. Additional documents showed that, contrary to his testimony, Rothman [redacted]. *E.g.*, Decl. ¶¶70(t), (v), (w), (x).

- ***Damages.*** Rothman produced documents that undermine his damages theory, including [redacted] *Id.* ¶¶70(e), (k), (m), (v).

- ***Mediation.*** Despite counsel's representations to the Court that Rothman had no documents from mediation, Rothman belatedly produced such documents, including his "Opening Remarks" expressing [redacted], emails exchanged during mediation, and, shockingly, [redacted] *Id.* ¶¶70(s)-(v).

This still was not the end of the privilege saga. On March 13, 2026, Rothman produced a *sixth* version of his log. *Id.* ¶71. A week later, on March 20-21, Rothman produced a *seventh* revised log and continued to produce documents he improperly had withheld. *Id.* ¶¶73, 75.

Rothman's *seventh* log flouted the Court's rulings. Rothman withheld, based on more than 1,600 entirely new claims of work product, a vast number of documents he previously had been ordered to produce. *Id.* ¶75(a). Rothman made almost no effort to make the claims fit; for many documents, Rothman did not even alter the existing description, *e.g.*, *id.* at ROTHMAN_PRIV_00000049, _00000120, or he added only vague additional information, *e.g.*, *id.* at ROTHMAN_PRIV_00000308 (adding that document contains "mental impressions and legal strategy of counsel"), _00000321 (same).

Rothman's evasions did not end there. Rothman long had improperly withheld emails to and from Martha Schar, wife of former co-owner Dwight Schar. ECF 200 at 14. Rothman's counsel represented that "the e-mail address titled 'Martha Schar' [was] used by Dwight Shar [sic] to communicate directly with his attorneys." ECF 229-1 at 10. The Court "credited Plaintiff's statements" and did not compel production of these documents. ECF 246 at 1. Rothman promptly exploited the Court's good faith: on his *seventh* log, he altered the descriptive metadata for more than 1,000 entries to replace "Martha Schar" with "Dwight Schar" and append Mr. Schar's name to the "theschars@aol.com" handle. Decl. ¶75(b). This metadata was false—and Rothman knew it: in a September 4, 2020 email Rothman received, Mrs. Schar said Mr. Schar (an octogenarian billionaire) had [redacted] *Id.* ¶73(a). The Court reached the same conclusion. Following *in camera* review of randomly selected documents, the Court found what Rothman was trying to hide: the documents made it "immediately clear" that "Mr. Schar was not using the e-mail address" as Rothman's counsel had represented. ECF 246 at 1. The Court ordered production of all documents to or from "theschars@aol.com." *Id.*

On March 24, 2026, Rothman also moved to stay the Bank's review of documents obtained from FedEx via third-party subpoena under claim of work product, despite FedEx and Smith's estate never asserting work product. ECF 242. The Court granted the stay but observed that "Plaintiff added work product designations to many FedEx documents *after* Defendants successfully asserted the waiver of attorney-client privilege.... This is not the first time Plaintiff has altered

its privilege log to defend against Defendants' motions regarding its deficiencies. Such revisions are certainly untimely and could be construed as uncandid and disingenuous." ECF 244. The Court stayed review only of documents over which Rothman had claimed work product as of February 4, 2026, *id.*, and on March 31, 2026, Rothman withdrew his stay motion. ECF 245.

### 2. The Special Master Uncovered More Abuse

After seven logs, Rothman plainly could not be trusted to make privilege calls. Among other things, the Bank had shown that documents it had obtained by third-party subpoenas demonstrated that Rothman was misstating the contents of documents he was withholding. *E.g.*, ECF 200 at 11. The Court reviewed a subset of withheld documents and, on April 3, 2026, found that despite "ample opportunity and incentive" to produce a defensible log, "Plaintiff's privilege review was not carefully performed" and in "numerous instances" documents "did not match the description" Rothman provided and "did not solicit or convey legal advice." ECF 251 at 2. Accordingly, the Court appointed a Special Master to review all documents Rothman still was withholding. ECF 251.

On April 6, 2026, Rothman produced his *eighth* privilege log and a revised privilege log of documents from his transaction lawyer, David Koche (the "Gunster Log"). Decl. ¶86. Meanwhile, between April 3 and 6, 2026 (after exchanging expert reports), Rothman produced another 2,067 documents, including more material documents concerning his negotiations with Snyder and communications with his advisors about share value. *Id.* ¶¶72, 84-85.

On April 21, 2026, Rothman sent his revised privilege logs to the Special Master. In direct violation of the Court's March 25, 2026 Order, Rothman again attempted to assert belated work-product claims. ECF 260. On April 23, 2026, the Court found Rothman was "not permitted to amend his privilege log to assert privileges not claimed as of February 4, 2026." ECF 261. Rothman then produced a new log to the Special Master and more highly material documents to the Bank that he had withheld under untimely work product claims. Decl. ¶¶91-93.

More problems persisted. After reviewing the *ninth* privilege log submitted to the Special Master, the Bank discovered that the log omitted documents that had been on Rothman's *fourth* log and thus did not include all documents ordered for the Special Master's review. *Id.* ¶95. On May 11, 2026, Rothman provided a supplemental log to the Special Master. *Id.* ¶96. On May 12, Rothman produced additional material documents, including documents concerning his motivations to sell his shares. *Id.* ¶97. On June 18, 2026, the Special Master issued a Report and Recommendation, finding Rothman continued to improperly withhold over 900 documents under erroneous privilege claims (a quarter of the documents remaining on his log after nine attempts). ECF 348.

Nearly a month later, in July 2026—more than 17 months after the Bank served document requests and three months after summary judgment motions—Rothman produced more than 1,000 documents, including yet additional highly material documents none of which the Bank could use in fact discovery, expert discovery, or summary judgment. Decl. ¶102. For example, Rothman withheld (1)

[redacted]

On July 2, 2026, Rothman sparked two more months of disputes by objecting to the Special Master's report. ECF 350. He argued that his communications with his son and son-in-law were privileged because they worked at his company (Black Diamond), which he claimed was jointly represented with him in this case. *Id.* at 2. At an August 3, 2026 hearing, the Court noted it had "already discussed this" issue but gave Rothman another chance to identify a shared legal interest. ECF 366 at 15. When pressed to identify that interest, Rothman's counsel asked "Is that required?", stated he was "not familiar" with the documents, and stated "I don't know off the top of my head what the common legal interest is." *Id.* at 22. The Court called this "frustrating," as "plaintiffs have been asked so many times to describe the basis for these privileges," and said it was "struggling with how" "to give plaintiffs the benefit of the doubt." *Id.* at 12, 14.

On September 11, 2026, after more evidentiary submissions, the Court found that Rothman had failed to prove a joint representation with Black Diamond or any shared legal interest. ECF 378 at 15-25. The Court also noted that, even after *ten* versions of a log and numerous warnings, Rothman's document descriptions remained inaccurate. *Id.* On September 18, 2026, Rothman objected again,

faulting the Court for not giving him yet another bite at the apple. ECF 379 at 1-2. On September 28, 2026, the District Court overruled that objection. ECF 385 at 11. As recently as *this week*, Rothman continued to produce documents he had improperly withheld. Decl. ¶118.

## LEGAL STANDARD

Rule 37(b) authorizes "dismissing the action … in whole or in part" for failure "to obey an order to provide or permit discovery." Rule 41(b) similarly permits dismissal for failure "to comply with" a "court order." Under either rule, dismissal is appropriate when the party's misconduct "is due to willfulness, bad faith or fault," *Phipps v. Blakeney*, 8 F.3d 788, 790 (11th Cir. 1993), and "[w]hen lesser sanctions would be ineffective," *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1544 (11th Cir. 1993); *see Rasmussen v. Cent. Fla. Council Boy Scouts of Am., Inc.*, 412 F. App'x 230, 232 (11th Cir. 2011). "When a party demonstrates a flagrant disregard for the court and the discovery process, … dismissal is not an abuse of discretion." *Aztec Steel Co. v. Fla. Steel Corp.*, 691 F.2d 480, 481 (11th Cir. 1982). Moreover, "the need for sanctions is heightened when the misconduct relates to the pivotal or linchpin issue in the case." *Hornady v. Outokumpu Stainless USA,* 572 F. Supp. 3d 1162, 1186-87 (S.D. Ala. 2021).

## ARGUMENT

Rothman's discovery misconduct warrants dismissal. He acted willfully and in bad faith: he knowingly made misrepresentations to the Court about the existence of mediation documents critical to the Bank's defense; fabricated

metadata to avoid producing documents; repeatedly manipulated privilege claims to circumvent production orders; and falsely described logged documents and refused to correct them. Rothman's misconduct has severely prejudiced the Bank, as explained below. And lesser sanctions have proven futile: despite multiple monetary penalties, multiple orders compelling compliance, warnings from the Court, and the appointment of a Special Master, Rothman has responded to each Court Order with continued evasion. Rothman should not be allowed to continue to benefit from his deliberate obstruction.

## I. Rothman's Discovery Misconduct Was Bad Faith

Dismissal is warranted when discovery misconduct reflects "willfulness, bad faith or fault." *Phipps*, 8 F.3d at 790. Bad faith includes "delaying or disrupting the litigation or hampering the enforcement of a court order." *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009). "When a litigant has been given ample opportunity to comply with court orders but fails to effect any compliance, the result may be deemed willful." *Compania Interam. Export-Import v. Compania Dominicana de Aviacion*, 88 F.3d 948, 952 (11th Cir. 1996).

Here, the Court need look no further than its own findings: as early as October 14, 2025, the Court found that not even a "court order was very effective" in persuading Rothman to comply, and as recently as August 3, 2026, the Court found Rothman still withholding documents the Court "already ruled … should be produced." Decl. ¶¶23, 104. Given the breadth and persistence of the misconduct, and Rothman's refusal to comply with Court Orders despite many warnings and

opportunities, mere incompetence is no longer credible. At any rate, mistakes are no excuse, as "either an incompetent lawyer or an impertinent lawyer may act in bad faith if [he] willfully disregards court orders." *Yaffa v. Weidner*, 717 F. App'x 878, 886 (11th Cir. 2017). Although Rothman's conduct satisfies the bad-faith standard many times over, four specific instances stand out.

*First*, Rothman misrepresented whether he had documents from the January 2021 mediation. That mediation is a key event because it is where (a) Rothman claims McCabe made false statements that induced him to sell, and (b) Rothman negotiated the ultimate sale price. In opposing a motion to compel production of mediation documents, Rothman's counsel represented to the Court that Rothman had "no documents from the mediation," "no documents" were "created in the mediation," and such documents "don't exist." Decl. ¶22.

Those statements were all false. After six months of motions, Rothman was forced to produce: (1) opening remarks he delivered during mediation; (2) [redacted]; (3) emails discussing statements made during mediation; and (4) [redacted]. *Id.* ¶¶70(s), (q), (r), (u), (v).

Where a party represents that a reasonable search found nothing responsive, courts do not hesitate to find bad faith (even when it turns out the party failed to look). *See Sell v. Country Life Ins. Co.*, 189 F. Supp. 3d 925, 930-33 (D. Ariz. 2016). Here, the facts are far worse, as Rothman's counsel found responsive documents that severely undermined Rothman's claims and actively made misrepresentations

to the Court three times before burying the documents on a 9,000+ entry privilege log. Calculated misdirection and false statements are the hallmark of bad faith.

*Second*, Rothman intentionally manipulated metadata to withhold more than 1,000 documents the Court ordered produced. This began when Rothman's counsel misrepresented to the Court that emails to or from Martha Schar were privileged because co-minority owner "Dwight Schar used an e-mail address *named* 'Martha Schar' [theschars@aol.com] to communicate with his attorneys." ECF 246 at 1 (emphasis added). The Court initially "credited Plaintiff's statement" and did not order emails produced from that email address. *Id.* To take advantage of the joint-client exception the Court had credited, Rothman then changed the metadata on his log by swapping Mr. Schar's name for Mrs. Schar's on more than 1,000 entries and claiming privilege over those entries. After *in camera* review of a subset of the emails, the Court found it was "*immediately clear* … that Mr. Schar was not using the email address." *Id.* at 1-2 (emphasis added).

Rothman's tampering with metadata also is the type of misconduct courts find is bad faith. *See, e.g.*, *Donofrio v. Ikea US Retail, LLC*, 2024 WL 1998094, *34 (E.D. Pa. May 6, 2024) ("IKEA's tampering with the metadata … further supports a … finding that IKEA acted in bad faith"). That Rothman, after the Court credited his representation, altered his privilege log to say that 1,000 emails came from "Dwight Schar" when it was "immediately clear" from the documents themselves they did not, ECF 246, is clear bad faith. And Rothman's ensuing production revealed what he fought so hard to hide: among other things, an email showing

that, [redacted]. Decl. ¶85(b). This document undercuts two pillars of Rothman's case—his claims that he was forced to sell and that the sale price was unfair. Concealed emails show the opposite: Rothman chased Snyder to do a deal, and Rothman drove the ultimate sale price.

*Third,* Rothman continued his evasions by repeatedly responding to the Court's orders overruling claims of privilege by asserting untimely work product claims. Comparing the operative *fourth* version of Rothman's log to his *seventh* version, Rothman added more than 1,600 work product claims to documents the parties had been litigating for four months. The Court immediately saw through Rothman's chicanery, saying it "could be construed as uncandid and disingenuous," and ordered him to remove all untimely work product claims. ECF 244. Despite this warning, Rothman tried the same tactic again a month later, forcing the Court to order him again to stop. ECF 261. Productions just this past week, for example, show that Rothman continued to withhold redacted documents in contravention of that Order. Decl. ¶117.

*Fourth*, as the Court recognized, Rothman serially misrepresented the contents of documents he withheld as privileged, despite numerous warnings from the Court and Bank. *E.g.* ECF 378 at 7-15. The Bank initially uncovered this problem by comparing documents received from third-party subpoenas to documents Rothman logged. ECF 176 at 6; ECF 200 at 5-6. Rothman's productions then confirmed it. For example, Rothman described a material email to his co-

minority owners (non-lawyers) about valuation as containing "legal advice regarding arbitration and related investigation." Decl. ¶70(m). And he described his opening remarks at mediation as containing "privileged communication involving legal advice regarding a confidential mediation and arbitration process." *Id.* ¶70(s). *See also id.* ¶¶70(c), (d), (e), (g), (l), (n), (p), (r), (u), (w), 73(a)-(c).

The Bank was forced to litigate a log that was inaccurate and incomplete, and that Rothman refused to correct despite being repeatedly confronted by the Court and Bank with his inaccurate representations. This, too, reflects bad faith. *See, e.g.*, *Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485, 508-10 (N.D. Ohio 2013) (considering incorrect log descriptions when finding bad faith warranted dismissal); *Gass v. CBOCS, Inc.*, 2012 WL 13447868, *6-7 (N.D. Ga. Jan. 17, 2012) (bad faith warranting waiver where log entries were vague and untimely).

Together, these are not unrelated missteps; they are four iterations of a sustained strategy to obstruct, obfuscate, and object at the last minute to court-ordered productions. And these are just four of the more egregious examples; others abound, as described above and in the attached Declaration, and can be submitted to the Court at a hearing. Courts treat such recurring machinations as conclusive evidence of bad faith. *See Metricolor, LLC v. L'Oréal USA, Inc.*, 2024 WL 1376476, *17-21 (C.D. Cal. Mar. 29, 2024) (finding willfulness, bad faith, and fault where party fabricated, destroyed, and withheld evidence, holding litigant's "dishonesty" supports "terminating sanctions with prejudice"); *Taser Int'l, Inc. v. Phazzer Elecs., Inc.*, 2024 WL 185370, *3 (M.D. Fla. Jan. 17, 2024) (rejecting

party's discovery position where record showed he "lie[d] and misdirect[ed] until confronted with irrefutable evidence"). So, too, here. Each time the Bank cornered Rothman with a Court order, he devised a new evasive maneuver. This pattern compels a finding of bad faith, and such "flagrant disregard for the court and the discovery process" justifies dismissal. *Aztec*, 691 F.2d at 481-82.

## II. Rothman's Misconduct Severely Prejudiced the Bank

Prejudice is not required to dismiss a case under Rule 37. *See, e.g.*, *Rasmussen*, 412 F. App'x at 232 ("willful bad faith conduct that cannot be deterred by lesser sanctions [is] sufficient under [11th Circuit] precedent to support" dismissal sanction); *Aztec*, 691 F.2d at 482 (sanctions intended to "insure the integrity of the discovery process"). But such sanctions are intended in part "to prevent unfair prejudice to the litigants." *Gratton v. Great Am. Commc'ns*, 178 F.3d 1373, 1374 (11th Cir. 1999). The Eleventh Circuit has affirmed dismissals where a plaintiff "prevent[s] ... defendants from obtaining information essential to preparing their defense." *Bevan v. Lee Cnty. SO*, 213 F. App'x 824, 827 (11th Cir. 2007); *Lainez v. Edwards*, 2019 WL 2022066, *6 (S.D. Fla. May 8, 2019).

That has occurred here. Rothman knowingly withheld evidence in defiance of Court orders, depriving the Bank of the opportunity to effectively conduct discovery, incorporate admissions into expert reports, and use material documents in summary judgment briefs. Moreover, by denying the Bank the opportunity to confront witnesses with these documents in depositions, Rothman "significantly diminished" the Bank's "ability to use the documents effectively at trial." *Inmuno*

*Vital, Inc. v. Telemundo Grp., Inc.*, 203 F.R.D. 561, 573 (S.D. Fla. 2001). Four categories of documents illuminate the severe prejudice to the Bank.

***1. Rothman's Awareness of McCabe's Role.*** As discussed, McCabe's role and Rothman's awareness of it are central to Rothman's claims. Rothman improperly withheld documents showing his contemporaneous understanding that McCabe was advising and representing Snyder in 2020-21. Rothman waited until February 13, 2026—three days after his deposition—to produce his affidavit from the 2020 arbitration admitting that [redacted] Decl. ¶62(c). Rothman then waited until March 13, 2026 to produce his own June 15, 2020 email recounting the key June 14, 2020 call with McCabe [redacted] *Id.* ¶70(d). The email makes clear that, contrary to Rothman's claims, he did not rely on McCabe; [redacted] He also waited to produce his October 5, 2020 email showing [redacted] *Id.* ¶70(o).

Rothman similarly withheld until March 2026 his June 12, 2020 email [redacted], as well as his own August 2020 summary to advisors describing [redacted]. *Id.* ¶¶70(c), (k). Rothman waited to produce a copy of the June 28, 2020 letter with handwritten notes (apparently by Rothman) acknowledging awareness of McCabe's role [redacted] as well as a January 2021 email reiterating that [redacted]

[redacted]. *Id.* ¶¶73(b)-(c). And he withheld until October 2, 2026 an email proving he knew [redacted] *Id.* ¶117. Because Rothman concealed this evidence, the Bank could not examine witnesses about these admissions—precisely the prejudice of withholding "information essential to preparing [a] defense," *Bevan*, 213 F. App'x at 827. Worse, Rothman tried to capitalize on his success withholding documents, arguing on summary judgment that there was no dispute that McCabe presented himself as a third-party neutral with [redacted] ECF 279 at 7, 17. The specter that summary judgment could be decided on this manufactured basis is the ultimate prejudice.

***2. Mediation Position.*** Rothman also concealed until after discovery closed documents showing he was the driving force behind the $875 million price he claims was fraudulently foisted on him. His January 13, 2021 mediation notes, Opening Remarks, and January 14, 2021 position statement—all withheld despite counsel's representation that Rothman had no documents "from the mediation"—confirm that [redacted]. Decl. ¶¶70(q)-(v). Other late-produced documents show that [redacted]. *Id.* ¶93(a). The Bank was denied the opportunity to confront Rothman (or his witnesses) with these admissions, test his expert's damages theories with them, or use them in expert reports.

***3. The 2018 Line of Credit.*** Rothman also withheld until March 13, 2026 communications with his transaction lawyer (Koche) that undermine his assertion that the Bank somehow conspired with Snyder to permit him to take out a

fraudulent $55 million loan in 2018. The documents show that, even at the time, [redacted]. *Id.* ¶¶70(a), (h). And in another document not produced until September 30, 2026, Rothman himself admitted that [redacted]. *Id.* ¶116(a). The Bank could not depose Rothman, his advisors, or experts about any of these improperly withheld documents.

***4. Damages Calculation.*** Rothman's late-produced documents likewise undercut his damages theory. [redacted]. *Id.* ¶¶70(i), (m), (v). Rothman also withheld until April 28, 2026—two days before summary judgment was due—his counsel's [redacted]. *Id.* ¶93(a). The Bank's experts could not effectively use this evidence, nor could the Bank use it to confront Rothman's experts.

The pattern is unmistakable: Rothman withheld the most damaging documents until after the Bank could use them. Each category goes to a linchpin issue—McCabe's disclosed role as an advisor to Snyder, Rothman's lack of reliance on McCabe, Rothman's repeated pushing of a $900 million sale price, Rothman's proposal of the $875 million sale price, and purported damages. "The need for sanctions is heightened when the misconduct relates to the pivotal or linchpin issue in the case." *Hornady*, 572 F. Supp. 3d at 1186-87. Nor can this misconduct

be cured by reopening a deposition or supplementing expert reports. Rectifying the prejudice of a year of bad faith would require re-doing all of fact and expert discovery and summary judgment briefing, at enormous expense. And given the scope of the misconduct, the Bank is far from certain it has uncovered everything. This is precisely the irremediable prejudice Rule 37 is designed to redress.

## III. Dismissal is the Only Appropriate Remedy

In considering sanctions, courts weigh "the triple objective" of (1) curing prejudice, (2) punishing misconduct, and (3) deterring future similar acts. *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 135 (S.D. Fla. 1987). Here, all three make clear that only dismissal will suffice.

***1. Curing prejudice.*** Rothman concealed troves of key documents until after fact depositions, expert reports, expert depositions, and summary judgment briefing. No fee award or adverse inference can restore the Bank's lost opportunity to litigate this case, and no plaintiff verdict could be trusted on such a manipulated record. *See Sell*, 189 F. Supp. 3d at 944-45 (entering default where misconduct went "directly to the heart of" the case and lesser sanction could not remedy resulting unfairness). Given the scope of the misconduct and its infection of every stage of proceedings, we are beyond where lesser remedies would suffice.

***2. Punishing misconduct.*** No lesser sanction has worked. The Bank obtained compulsion orders (ECF 140, 167, 180, 233, 246, 251), sanctions (ECF 140, 233, 234, 239), and Special Master oversight (ECF 251, 348). Each time, Rothman deployed a new maneuver—a new log, a new work product claim, altered

metadata—to obstruct and withhold. Where "less drastic sanctions would not ensure compliance," only dismissal remains. *Malautea*, 987 F.2d at 1542.

***3. Deterrence.*** A pattern of deliberate and damaging discovery misconduct like Rothman's is why courts have the power to impose terminal sanctions. As the Eleventh Circuit has instructed, an "ask-for-forgiveness-rather-than-permission rule would strip sanctions of any deterrent effect—malicious actors could repeatedly violate court orders with peace of mind, knowing that any future sanction could be nullified after the fact by simple compliance with the initial order." *Hornady v. Outokumpu Stainless USA, LLC*, 118 F.4th 1367, 1379 (11th Cir. 2024). The Court here imposed lesser sanctions—compulsion orders, sanctions, and Special Master oversight. Yet Rothman's misconduct persisted.

With his repeated, bad-faith stonewalling, Rothman has forfeited his right to pursue this case. *E.g.*, *Eagle Hosp.*, 561 F.3d at 1306 (affirming default where bad-faith conduct made it impossible to know "the extent to which" case was compromised). Rothman knowingly made misrepresentations about the existence of responsive documents, manufactured sham privilege claims, and doubled down on each deception when cornered, abandoning one falsehood only to assert another. Dismissal is not merely warranted; it is the only sanction that protects the integrity of these proceedings.

## CONCLUSION

For these reasons, the Court should dismiss the Fourth Amended Complaint with prejudice.

Respectfully submitted,

| | |
|---|---|
| */s/ Enu A. Mainigi* | */s/ Michael S. Hooker* |
| Enu A. Mainigi, Lead Counsel *(Pro Hac Vice)* | Michael S. Hooker \| FBN 330655 |
| Williams & Connolly LLP | Phelps Dunbar LLP |

*Counsel for Defendants*

Dated: October 7, 2026

**Certificate of Service**

I hereby certify that, on this 7th day of October 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF filing system, which will send electronic notice of filing to all counsel of record.

*/s/ Enu A. Mainigi*
Enu A. Mainigi (*Pro Hac Vice*)
Williams & Connolly LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
emainigi@wc.com
*Attorney for Defendants*

**Local Rule 3.01(g) Certification**

In accordance with M.D. Fla. Local Rule 3.01(g), Bank of America's counsel conferred with Plaintiff's counsel via video conference on October 7, 2026, in a good-faith effort to resolve the issues raised by this motion, to no avail. Plaintiff opposes the motion.

Respectfully submitted,

*/s/ Eden Schiffmann*
Eden Schiffmann

Date: October 7, 2026